Justice Stevens,
concurring in the judgment.
When Congress fails to define potentially ambiguous statutory terms, it effectively delegates to federal judges the task of filling gaps in a statute. See Commissioner v. Fink, 483 U. S. 89,104 (1987) (Stevens, J., dissenting) (“In the process of legislating it is inevitable that Congress will leave open spaces in the law that the courts are implicitly authorized to fill”). Congress has included definitions of the term “proceeds” in some criminal statutes,[1] but it has not done so in 18 U. S. C. § 1956 (2000 ed. and Supp. V), the money laundering statute at issue in this case. That statute is somewhat unique because it applies to the proceeds of a varied and lengthy list of specified unlawful activities, see § 1956(c)(7) (defining “specified unlawful activity” to include, inter alia, *525 controlled substance violations, murder, bribery, smuggling, various forms of fraud, concealment of assets, various environmental offenses, and health care offenses).
Although it did not do so, it seems clear that Congress could have provided that the term “proceeds” shall have one meaning when referring to some specified unlawful activities and a different meaning when referring to others. In fact, in the general civil forfeiture statute, §981, Congress did provide two different definitions of “proceeds,” recognizing that — for a subset of activities — “proceeds” must allow for the deduction of costs. Compare § 981(a)(2)(A) (2000 ed.) (defining “proceeds” in cases involving illegal goods and services to mean “property of any kind obtained directly or indirectly ... not limited to the net gain or profit realized from the offense”) with § 981(a)(2)(B) (defining “proceeds” with respect to lawful goods sold in an illegal manner as the amount of money acquired “less the direct costs incurred in providing the goods or services”).
We have previously recognized that the same word can have different meanings in the same statute.[2] If Congress could have expressly defined the term “proceeds” differently when applied to different specified unlawful activities, it seems to me that judges filling the gap in a statute with such a variety of applications may also do so, as long as they are conscientiously endeavoring to carry out the intent of Congress. Therefore, contrary to what Justice Alito and the plurality state, see post, at 546 (dissenting opinion); ante, at 522-523 (plurality opinion), this Court need not pick a single definition of “proceeds” applicable to every unlawful activity, no matter how incongruous some applications may be.
As Justice Alito rightly argues, the legislative history of §1956 makes it clear that Congress intended the term *526 “proceeds” to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales.[3] But that history sheds no light on how to identify the proceeds of many other types of specified unlawful activities. For example, one specified unlawful activity is the conduct proscribed by § 541, “Entry of goods falsely classified.” Section 541 provides that “[w]hoever knowingly effects any entry of goods, wares, or merchandise, at less than the true weight or measure thereof, or upon a false classification as to quality or value, or by the payment of less than the amount of duty legally due, shall be ... imprisoned not more than two years.” Conceivably the “proceeds” stemming from a violation of § 541 could be either the money realized by misstating the value — that is, the amount by which the criminal “profits” by paying reduced duties — or the total price at which the goods are later sold, even though the misclassification had only a trivial impact on that price.
Just as the legislative history fails to tell us how to calculate the “proceeds” of violations of § 541, it is equally silent on the proceeds of an unlicensed stand-alone gambling venture. The consequences of applying a “gross receipts” definition of “proceeds” to the gambling operation conducted by respondents are so perverse that I cannot believe they were contemplated by Congress, particularly given the fact that nothing in Justice Alito’s thorough review of the legislative history indicates otherwise.[4]
Constrained by a holding that the payment of expenses constitutes “promotion,”[5] Justice Alito’s opinion runs *527 squarely into what can be characterized as the “merger” problem. Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business. A money laundering conviction increases the statutory maximum from 5 to 20 years, and the Sentencing Commission has prescribed different Guidelines ranges for the two crimes.[6] When a defendant has a significant criminal history or Guidelines enhancements apply, the statutory cap of five years in § 1955 is an important limitation on a defendant’s sentence — a limitation that would be eviscerated if Justice Alito’s definition of “proceeds” were applied in this case.
Justice Alito and Justice Breyer suggest that the advisory nature of the Guidelines post-Booker, United States v. Booker, 543 U. S. 220 (2005), or the possibility of an amendment to the money laundering Guideline, would soften this blow, post, at 547 (opinion of Alito, J.); post, at 530-531 (dissenting opinion of Breyer, J.), and indeed they could. But the result in the case at hand might not be softened at all *528 by resort to Booker because respondents’ direct appeal was decided in 2000, several years prior to our decision in Booker. If Justice Alito’s opinion were to carry the day, both respondents would return to prison to serve the remainder of their lengthy sentences.
The revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not “proceeds” within the meaning of the money laundering statute. As the plurality notes, there is “no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime.” Ante, at 517. This conclusion dovetails with what common sense and the rule of lenity would require. Faced with both a lack of legislative history speaking to the definition of “proceeds” when operating a gambling business is the “specified unlawful activity” and my conviction that Congress could not have intended the perverse result that would obtain in this case under Justice Alito’s opinion, the rule of lenity may weigh in the determination. And in that respect the plurality’s opinion is surely persuasive.[7] Accordingly, I concur in the judgment.

 For example, 18 U. S. C. § 23390(e)(3) (2000 ed., Supp. V), which prohibits the concealment of proceeds derived from funds used to support terrorism, defines “proceeds” to mean “any funds derived from or obtained, directly or indirectly, through the commission of [the] offense.”

 See, e. g., General Dynamics Land Systems, Inc. v. Cline, 540 U. S. 581, 595 (2004) (rejecting the presumption that the term “age” had an identical meaning throughout the Age Discrimination in Employment Act of 1967).

 Thus, I cannot agree with the plurality that the rule of lenity must apply to the definition of “proceeds” for these types of unlawful activities.

 As Justice Auto notes, some reference was made in the legislative history to gambling as a part of a broader criminal syndicate’s activities. Post, at 539-540. But that reference does not indicate that Congress intended the “proceeds” of a gambling business to include gross receipts.

 The Seventh Circuit held on a prior appeal that respondent Santos’ actions were legally sufficient to convict him of promoting the carrying on of a business under § 1956, United States v. Febus, 218 F. 3d 784, 789-790 *527 (2000). Justice Alito criticizes the plurality for allowing the interpretation of “proceeds” to be “dictated by an unreviewed interpretation of another statutory element.” See post, at 548. I do not base my opinion on any disagreement with the interpretation of “promotion.”

 For example, under the 2007 Guidelines, the base offense level for running a gambling business is 12. United States Sentencing Commission, Guidelines Manual §2E3.1 (Nov. 2007) (USSG). Section 2S1.1, which provides the base offense level for money laundering, adds two levels to the base offense level for the underlying crime where the defendant is convicted under 18 U. S. C. § 1956. This scheme for determining the base offense level first appeared in the November 2001 Sentencing Guidelines. Prior to 2001, the difference between sentences for gambling and money laundering was even more pronounced, as USSG §2S1.1 (Nov. 2000) set an offense level of 23, which could be increased if the value of the funds exceeded $100,000.

 In what can only be characterized as the “purest of dicta,” the plurality speculates about the stare decisis effect of our judgment and interprets my conclusion as resting on the ground that “‘proceeds’ means ‘profits’ when there is no legislative history to the contrary.” Ante, at 523. That is not correct; my conclusion rests on my conviction that Congress could not have intended the perverse result that the dissent’s rule would produce if its definition of “proceeds” were applied to the operation of an unlicensed gambling business. In other applications of the statute not involving such a perverse result, I would presume that the legislative history summarized by Justice Alito reflects the intent of the enacting Congress. See post, at 531-532, and n. 1. Its decision to leave the term undefined is consistent with my view that “proceeds” need not be given the same definition when applied to each of the numerous specified unlawful activities that produce unclean money. Clark v. Martinez, 543 U. S. 371 (2005), poses no barrier to this conclusion. In Martinez there was no *529 compelling reason — in stark contrast to the situation here — to believe that Congress intended the result for which the Government argued.